## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NICHOLAS A. COX,

      Plaintiff,

v.

ANN (LNU), ET AL.,

      Defendants.

Case No. 12-CV-2678-DDC-GLR

## MEMORANDUM AND ORDER

Plaintiff Nicholas A. Cox filed this lawsuit against several defendants alleging that they violated the Eighth Amendment and Kansas state law by failing to provide him proper medical care during his incarceration at the New Century Adult Detention Center in Johnson County, Kansas. This matter comes before the Court on defendants Sheriff Frank Denning and Sergeant Duane Dvorak's Motion for Summary Judgment (Doc. 205); defendant Dr. Keith Pattison's Motion for Summary Judgment (Doc. 216); and defendants Correct Care Solutions, LLC ("CCS"), Nurse Ann, and Nurse Rethaford's (collectively, the "CCS Defendants") Motion for Summary Judgment (Doc. 221). In addition, plaintiff has filed a Motion for Continuance and for Defendant Pattison to Clear Up His Summary Judgment Motion (Doc. 234) and an Objection to Magistrate's Memorandum and Order (Doc. 251). For the following reasons, the Court grants defendants' motions for summary judgment and denies plaintiff's Motion for Continuance and for Defendant Pattison to Clear Up His Summary Judgment Motion and his Objection to Magistrate's Memorandum and Order.

1

## I.  Facts

The following facts are uncontroverted and stated in the light most favorable to plaintiff, the nonmoving party.  On October 7, 2011, plaintiff was arrested on charges of aggravated battery and booked into the New Century Adult Detention Center ("Detention Center") in Johnson County, Kansas.  Plaintiff remained in the Detention Center until April 13, 2012, when he was transferred to Larned State Hospital for a court-ordered medical exam.  Plaintiff was diagnosed with alcohol and drug dependence, posttraumatic stress disorder, antisocial personality disorder with borderline personality traits, and problems interacting with the legal system. Plaintiff was discharged from Larned and returned to the Detention Center on May 2, 2012. Defendant CCS provides general medical care for inmates at the Detention Center.  Upon his return, defendant Dr. Keith Pattison, a physician at the Detention Center, entered an order for plaintiff to receive two daily medications:  Wellbutrin XL 150 mg and Seroquel 100 mg.

Inmates at the Detention Center must take their medication during the standard medication pass times each day.  However, plaintiff soon began asking to receive his daily dosage at a different time, claiming the medicine was making him drowsy.  To make this request, plaintiff filled out and submitted three "Internal Complaint Forms" ("ICF") to prison medical staff between May 13 and May 16, 2012.  The medical staff denied all three of plaintiff's requests to take his medication at a different time, explaining that the Sheriff's Office, not medical staff, sets medication pass times.

Unsatisfied, plaintiff filed a grievance on June 1, 2012, again asking to take his medicine at a different time.  In this grievance, however, plaintiff admitted, "I have been cheeking my medication and taking it at a later time."  Doc. 223-5 at 1.  Detention Center and CCS policy both prohibit inmates from "cheeking" their medicine.  Paragraph 14(g)(2) of the Detention

Center Inmate Orientation, Guidelines, and Rules states, "When you are given your medication, you are to remain in front of the Nurse and [O]fficer and take the medication, then open your mouth to show the Nurse and Officer that you have swallowed the medication." Doc. 207-1 at 1. Under CCS policy, "Inmates found to be cheeking or palming medications will have the medications discontinued. If medications cannot be discontinued, medications will be crushed or given in liquid form if available, upon physician request and order." Doc. 223-18 at 3. Under this policy, Dr. Pattison entered an order discontinuing plaintiff's medication on June 1, 2012, the same day plaintiff admitted to the cheeking violation.

This decision prompted plaintiff to begin filing grievances requesting his medication. The Detention Center provides a system for inmates to file grievances with supervisors in various parts of the prison (*i.e.*, medical, food service, security). Grievances are screened initially by the Grievance Coordinator, who reviews each grievance and then decides whether to accept or reject it. The grievance procedures prescribe several reasons making rejection appropriate, one of which applies when the inmate has failed to use the grievance "levels." These grievance "levels" refer to an appeals system an inmate must exhaust before filing a lawsuit based on the grievance or before filing another grievance about the same issue. Initially, an inmate must file his grievance at "Level I"—to a sergeant, nursing supervisor, or food service director. The recipient must respond to the grievance within 5 days. If the grievance is denied, the inmate can appeal the adverse decision to "Level II." The plaintiff again must receive an adverse decision before appealing to "Level III," and the process repeats up to "Level IV." Defendant Sgt. Duane Dvorak served as the Grievance Coordinator for the grievances at issue in this case.

Plaintiff filed his first grievance requesting his medication on June 2, 2012, the day after Dr. Pattison discontinued it. Plaintiff directed this first grievance to the nursing supervisor, writing, "I am grieving the fact that my meds were taken. I have a serious mental health disease and I need them. They were taken without even consulting with me. This is a deliberate indifference to a serious medical need. I would like the name of who is responsible." Doc. 223-7. On the same day, plaintiff submitted a largely identical second grievance to "Mental Health," which again stated that plaintiff had a "serious medical need for those medications" and that discontinuing them was "deliberate indifference to my serious medical need." Doc. 223-9. Like the first grievance, the second June 2 grievance made no claim that plaintiff was physically sick or injured. On June 3, plaintiff filed a third grievance with "Mental Health." Doc. 223-10. This third grievance largely resembled the first two, except it stated, "I have been ill for 3 days withdrawing from my medication I shouldn't have had to withdraw[] from." *Id.*

On June 3, 2012, defendant Nurse Rethaford responded to plaintiff's first June 2 grievance, stating, "Your medication was discontinued by the Psychiatrist as it was reported, and you have yourself confirmed, that you were cheeking your medication." Doc. 223-8. On June 4, Sgt. Dvorak, the Grievance Coordinator, provided a response to plaintiff rejecting his second June 2 grievance and his June 3 grievance because those two grievances complained about the same incident as plaintiff's first one. Sgt. Dvorak wrote: "All three grievances regard the same matter. Multiple grievances regarding the same matter will not be accepted. . . . [Y]ou may grieve to Lt. Prothe [at Level II] if you are not satisfied." Doc. 223-11 at 1.

Plaintiff followed Sgt. Dvorak's suggestion and continued the internal appeals process, filing a grievance with Lt. Prothe on June 5, 2012. The June 5 grievance was the first time plaintiff complained about specific symptoms: "I suffered headaches, throwing up,

sleeplessness, and other untold injury . . . ." Doc. 212 at 24. Lt. Prothe rejected this grievance because plaintiff had admitted to cheeking his medicine, but he also wrote: "You list several medical needs in your ICF. You should submit a medical request form if you want these to be addressed by our medical staff." Doc. 212 at 25. Unlike grievances, which the Grievance Coordinator screens, medical request forms go directly to prison medical staff. Under CCS policy, "Inmates will have the opportunity to request health care daily. Their requests will be documented, triaged and referred as appropriate." Doc. 223-19 at 1. CCS policy also states that "inmates do not go through security staff for non-emergent health care requests." *Id.*

Also on June 5, plaintiff submitted an ICF addressed to "Psych Dr." Doc. 223-12. It stated, "I need my meds. I am very mentally ill." *Id.* In response, defendant Nurse Ann wrote, "Mr. Cox, Dr. Pattison has denied your medications." *Id.* On June 8, 2012, plaintiff submitted a Request for Medical Care that said: "I NEED MY MEDS." Doc. 223-13. At the bottom of this Request, someone wrote, "Reply on ICF," referring plaintiff to the decision denying his June 5 ICF. *Id.* The June 8 Request for Medical Care was the only request plaintiff submitted directly to the medical staff during the times relevant to this lawsuit.

On June 9, 2012, plaintiff continued the appeal of his original June 2 grievance. He submitted a grievance to Capt. Shafer (Level III) that said, "I have sustained injury (physical), pain, and suffering. The doctor hasn't seen me or responded. It's been 10 days. I have suffered through depression, a broken finger, headaches, throwin[g] up, and other issues . . . ." Doc. 212 at 26. Capt. Shafer denied this grievance and instructed plaintiff to complete a "medical request form" to be treated by the medical staff. Doc. 212 at 27. On June 14, 2012, plaintiff filed a grievance with Major Cortright, the last level of appeal (Level IV). Plaintiff again complained about the decision to discontinue his medication and stated that he had suffered a broken finger.

Major Cortright denied plaintiff's grievance but discussed plaintiff's allegedly broken finger.  He wrote:  "I talked with the Medical Staff and they state they have no documentation of any type of finger injury.  They tell me that you have not requested to see them for this issue.  I have asked that you be added to the list to be seen for your finger and they assured me that you would be seen."  Doc. 212 at 30.

On June 14, Dr. Pattison entered an order for plaintiff to begin receiving his medication again.  Nevertheless, plaintiff refused to take his medicine on June 14-18, 20-22, 24, 26, and 30; July 4, 6, 8, 12, 14, 18, 20, 22, and 28; August 21, 23, 25, 27, and 29; and September 5.  Doc. 222-5 at 1.  On June 15, plaintiff's finger was examined in the prison medical clinic, but the treating doctor found "no noticeable issues" with his finger.  Doc. 223-15.  The doctor ordered an x-ray which revealed "no fracture, dislocation or bony reaction."  Doc. 223-16.

Plaintiff filed this lawsuit in state court on September 14, 2012, and defendants removed the case on October 18, 2012.  Plaintiff has twice amended his initial pleading, and the Second Amended Complaint (Doc. 159) now controls.  Counts I-III of the Second Amended Complaint assert claims under 42 U.S.C. § 1983 that defendants were deliberately indifferent to his serious medical needs when they failed to treat him during the two week period he was off of his medication.  Counts IV and V bring state law negligence claims against defendants.  Defendants have filed three motions for summary judgment, which the Court considers here.

## II.  Legal Standards

### A.  Pro Se Litigant's Lack of Compliance with Local Rules

Defendants satisfied D. Kan. Rule 56.1(f) by sending plaintiff a "Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment" for each of the three motions they filed.  *See* Docs. 208, 224, 226.  These notices advised plaintiff that if he did "not respond to the

motion[s] for summary judgment on time with affidavits and/or documents contradicting the material facts asserted by the defendant[s], the court may accept defendant[s'] facts as true, in which event [plaintiff's] case may be dismissed and judgment entered in defendant[s'] favor without a trial."

Plaintiff explicitly declined to respond to Dr. Pattison's and the CCS Defendants' motions for summary judgment.  Doc. 251 at 2.  He filed a brief opposing Sheriff Denning and Sgt. Dvorak's motion for summary judgment (Doc. 212) but failed to controvert facts asserted by those defendants or support facts he included for the first time in his brief.  Our Court's local rules provide that "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."  D. Kan. Rule 56.1(a).  To controvert facts in the fashion the rule requires, the nonmoving party must number the facts and "refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed."  D. Kan. Rule 56.1(b)(1).  Here, plaintiff has disputed some of defendants' facts but failed to cite any part of the summary judgment record for support.  Because plaintiff has not controverted defendants' facts in the manner prescribed by the local rules, the Court deems defendants' properly supported facts admitted and accepts them as true.

In addition, plaintiff has asserted 14 additional factual statements as part of his brief opposing Sheriff Denning and Sgt. Dvorak's motion for summary judgment.  Defendants have controverted all 14 statements, arguing plaintiff did not support them properly as required by Fed. R. Civ. P. 56(c) and D. Kan. Rule 56.1(b).  D. Kan. Rule 56.1(b)(2) provides, "If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party must set forth each additional fact in a separately numbered paragraph, supported by

references to the record . . . ."  The Court has reviewed plaintiff's statements of fact and

concludes that he has supported just two with citation to the record.  The Court considers those

two but need not accept the rest.

Although plaintiff is a pro se litigant and the Court must construe his filings liberally, the

Court will not serve as his advocate and will not accept as true conclusory allegations

unsupported by evidence in the record.  *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).

Plaintiff's pro se status does not excuse him from complying with federal and local rules.

*Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) ("This court has repeatedly insisted that

pro se parties follow the same rules of procedure that govern other litigants."  (citations and

internal quotation marks omitted)).  Thus, the Court does not accept plaintiff's factual statements

that are not supported by proper evidence.

### B.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  When it applies this standard, the Court views the evidence and draws

inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625

F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a

reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if

under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.*

(quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary

judgment and the burden of establishing that summary judgment is appropriate as a matter of

law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (internal quotation marks omitted).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (internal quotation marks omitted).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  *Id.* (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671.  A court "need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

Summary judgment is not a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

### C.  Qualified Immunity Standard

Sheriff Denning and Sgt. Dvorak, as municipal employees, assert a qualified immunity defense in their motion for summary judgment.  When a defendant moves for summary judgment based on qualified immunity, the Court applies a different standard than the one applied to summary judgment rulings.  *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).  "When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a strict two-part test:  first, the plaintiff must show 'that the defendant's actions violated a constitutional or statutory right'; second, the plaintiff must show that this right was 'clearly established at the

time of the conduct at issue.'" *Id.* (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000)). "'If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Id.* (quoting *Nelson*, 207 F.3d at 1205).

To decide whether the plaintiff has met his burden of establishing a constitutional violation that was clearly established, the Court must construe the facts in the light most favorable to plaintiff. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, as with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Id.* (citations and internal quotations marks and alterations omitted).

### III. Analysis

#### A. Plaintiff's Motion for Continuance and for Defendant Pattison to Clear Up His Summary Judgment Motion (Doc. 234)

Before reaching defendants' summary judgment motions, the Court must discuss plaintiff's Motion for Continuance and for Defendant Pattison to Clear Up His Summary Judgment Motion, which he filed on July 21, 2014. In the motion, plaintiff points out an error in Dr. Pattison's memorandum in support of his motion for summary judgment (Doc. 217). Dr. Pattison's memorandum refers to an Exhibit 2 with page numbers that do not correspond to the Exhibit 2 that he attached to his memorandum. Furthermore, ¶ 7 of the memorandum identifies Exhibit 2 as "(Defendant Pattison's attached Exhibit 2, *Report by Dr. Joseph V. Penn*, pg. 24)."

Later paragraphs simply refer to Exhibit 2 at pages 24, 25, or 26.  *See* Doc. 217 at ¶¶ 8, 9, 12, 15, 18-22, 31, 33-37, 39, and 41.  But despite these references within the memorandum, Dr. Pattison attached plaintiff's Amended Petition (Doc. 55) as Exhibit 2.  It is evident that Dr. Pattison attached the wrong Exhibit 2 to his memorandum.

Plaintiff identifies this error in his motion but does not ask for any particular relief from the Court, other than a continuance.  Plaintiff argues that he "cannot accurately concur or challenge [Dr. Pattison's] uncontroverted facts if I do not have the appropriate exhibit."  Doc. 234 at 2.  But plaintiff need not challenge the facts citing Exhibit 2 because the party moving for summary judgment has the burden of supporting factual assertions by accurately citing the record.  Fed. R. Civ. P. 56(c).

The fact that Dr. Pattison misidentified an exhibit in his memorandum does not prevent the Court from granting summary judgment, however.  While the Court will not consider the factual statements supported by the misidentified Exhibit 2, the Court may still "grant summary judgment if the motion and supporting materials—including the facts considered undisputed— show that the movant is entitled to it . . . ."  Fed. R. Civ. P. 56(e)(3).  As fully discussed below, the Court has considered the properly supported undisputed facts in Dr. Pattison's memorandum in support of his motion for summary judgment and concludes that he is entitled to summary judgment on the claims against him in this lawsuit.

The only relief plaintiff requested in his July 21, 2014 motion was a continuance, which Judge Rushfelt eventually granted.  *See* Doc. 250.  Because the Court already has granted the sole relief plaintiff requested, the Court denies as moot plaintiff's Motion for Continuance and for Defendant Pattison to Clear Up His Summary Judgment Motion.

**B. 42 U.S.C. § 1983 – Deliberate Indifference to a Serious Medical Need**

The Court now turns to plaintiff's constitutional claims, Counts I-III in his Second

Amended Complaint. The Eighth Amendment prohibits unnecessary and wanton infliction of

pain caused by a prison official's deliberate indifference to serious medical needs of prisoners.

*Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014). Pretrial detainees—like plaintiff in

this case—are protected under the Fourteenth Amendment's Due Process Clause rather than the

Eighth Amendment. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

However, in pretrial detainee cases the Tenth Circuit "'applies an analysis identical to that

applied in Eighth Amendment cases brought pursuant to § 1983.'" *Id.* (quoting *Lopez v.*

*LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)). For that reason, the protection provided

plaintiff here is the same protection the Eighth Amendment provides prisoners.

An Eighth Amendment deliberate indifference claim requires a plaintiff to prove both an

objective and a subjective component. *Al-Turki*, 762 F.3d at 1192. The objective prong asks:

was the prisoner's medical condition "sufficiently serious" to violate the Eighth Amendment?

*Id.* The subjective prong asks: did the defendant-official know of and disregard an excessive

risk to inmate health or safety? *Id.*

**1. Plaintiff Has Failed to Present Evidence that His Injuries Were "Sufficiently Serious"**

Defendants are entitled to summary judgment on Counts I-III because plaintiff has failed

to produce sufficient evidence in support of the objective prong of the deliberate indifference

test. "A medical need is considered sufficiently serious to satisfy the objective prong if the

condition 'has been diagnosed by a physician as mandating treatment or is so obvious that even a

lay person would easily recognize the necessity for a doctor's attention.'" *Id.* at 1192-93

(quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)). "Where a prisoner claims

that harm was caused by a delay in medical treatment he must show that the delay resulted in substantial harm . . . ."  *Id.* at 1193 (citations and internal quotation marks omitted).  The "substantial harm" requirement can be satisfied by "lifelong handicap, permanent loss, or considerable pain."  *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).  "Thus, the 'substantial harm' caused by a delay in treatment may be a permanent physical injury, or it may be an 'intermediate injury, such as the pain experienced while waiting for treatment or analgesics.'"  *Id.* (internal citations omitted).  Although not every "twinge of pain" suffered as a result of delay in medical care is actionable, when the pain experienced during the delay is substantial, the prisoner sufficiently establishes the objective element of the deliberate indifference test.  *Id.*

In his Second Amended Complaint, plaintiff alleges that he felt severe withdrawal symptoms after Dr. Pattison discontinued his medication.  Specifically, plaintiff asserts that during the two week period without medicine he suffered:  "severe depression, throwing up, severe headaches/migraines, stomach aches/pains, loss of appetite, no sleep for three days, the 'shakes,' suicidal thoughts, and a broken finger."  Doc. 159 at ¶ 34.  He states that he sustained the broken finger on June 2, 2012, when he "punched the wall in frustration and desperation from medical staff letting me suffer."  *Id.* at ¶ 35.  Plaintiff asserts that his broken finger will cause "arthritis [] for the rest of my life."  *Id.* at ¶ 54.

Based on these allegations, the Court construes plaintiff's Second Amended Complaint to assert two types of "substantial harm":  (1) "intermediate injury" from the pain he suffered for the two weeks without his medication and (2) "permanent loss" from the broken finger he alleges will cause arthritis for the rest of his life.  *Al-Turki*, 762 F.3d at 1193.

The most significant problem with plaintiff's injury claims is that he has failed to support them with any evidence from the record as Fed. R. Civ. P. 56 and this Court's local rules require. As discussed above, plaintiff did not controvert any of the factual statements in defendants' motions for summary judgment, either because he did not respond to the motions or because he did not controvert defendants' facts by citing to the record.  As a result, the Court deems admitted all properly supported facts in defendants' three motions for summary judgment.[1] Plaintiff includes a statement of facts in his brief opposing Sheriff Denning and Sgt. Dvorak's motion for summary judgment but supports just two of the factual statements by citing the record.  Moreover, none of his factual statements reference the injuries plaintiff alleges he suffered.

Defendants each argue that plaintiff has presented no admissible evidence to show he suffered injuries during the two weeks he was off of his medication.  Having done so, the burden shifts to plaintiff to "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [he] carries the burden of proof."  *Kannady*, 590 F.3d at 1169 (internal citation omitted).  This requires plaintiff to identify facts by referencing affidavits, deposition transcripts, or specific exhibits incorporated in the depositions.  *Adler*, 144 F.3d at 671.  Here, however, plaintiff has not supported his claims with references to these types of evidence.  Additionally, he presents no expert testimony that the medication plaintiff was taking could cause the withdrawal symptoms he alleges.

The Court has examined the summary judgment record and has found only three pieces of evidence that could support plaintiff's injury claims.  First, in a June 3, 2012 grievance he wrote that he had been "ill for 3 days withdrawing from my medication," but he failed to identify

---

[1] As discussed above, this conclusion does not include the facts citing to Exhibit 2 in Dr. Pattison's memorandum in support of his motion for summary judgment because Dr. Pattison attached the wrong supporting exhibit to the memorandum.

the symptoms or the severity of his alleged illness.  Doc. 223-10.  Second, in a June 5 grievance plaintiff complained, "I suffered headaches, throwing up, sleeplessness, and other untold injury and the doctor or nurses did not see me or try to see me."  Doc. 212 at 24.  And last, in a June 9 grievance plaintiff wrote that he had "suffered through depression, a broken finger, headaches, throwin[g] up, and other issues, and I am still being denied medical care."  Doc. 212 at 26.  Because plaintiff never asserted these symptoms in his statement of facts with citations to particular parts of the record, the Court need not consider them.  Fed. R. Civ. P. 56(c)(3); D. Kan. Rule 56.1(b)(2).  Moreover, plaintiff's statements of injury are completely unsupported by any objective evidence and are thus simply bare allegations.

In contrast, defendants have proffered objective evidence showing plaintiff never suffered the injuries he claims.  Plaintiff's Second Amended Complaint alleges that he suffered a broken finger that will cause him arthritis for the rest of his life when he punched a wall on June 2, 2012.  However, plaintiff did not complain about this injury immediately, mentioning it for the first time in a June 9 grievance.  Plaintiff never submitted a medical request form to alert prison medical staff to a broken finger, but on June 15, shortly after plaintiff had submitted his June 9 grievance, Major Cortright scheduled a medical visit for plaintiff on his own initiative.  The examining doctor found no evidence of a broken finger, and a subsequent x-ray revealed "no fracture, dislocation or bony reaction."  Doc. 223-16.  As for plaintiff's other alleged injuries, he never submitted a medical request form to inform medical staff about his symptoms or to request treatment.  Also, once Dr. Pattison restarted plaintiff's medication, he refused it on June 14-18, 20-22, 24, 26, and 30; July 4, 6, 8, 12, 14, 18, 20, 22, and 28; August 21, 23, 25, 27 and 29; and September 5.  Doc. 222-5 at 1.

In sum, no reasonable juror could conclude from the evidence properly supported as part of the summary judgment record that plaintiff sustained injuries "sufficiently serious" to violate the Eighth Amendment.  Plaintiff has presented no objective evidence that he suffered the harm he alleges in his Second Amended Complaint.  Moreover, defendants present objective evidence negating plaintiff's bare and conclusory injury claims.  Plaintiff has failed to meet his evidentiary burden on the first prong of the deliberate indifference test.  Because plaintiff asserts a deliberate indifference claim in the first three Counts of his lawsuit and such a claim requires him to carry the burden on this first prong, the Court grants summary judgment for defendants on Counts I-III of the Second Amended Complaint.  Although plaintiff's failure to create a genuine issue of material fact on the first prong of the deliberate indifference test is sufficient by itself to grant summary judgment on Counts I-III, these Counts suffer from other, equally dispositive deficiencies.  The Court discusses them in subparts 2, 3, and 4, below.

### 2.  Count I – Dr. Pattison, Nurse Ann, and Nurse Rethaford

Count I asserts that Dr. Pattison, Nurse Ann, and Nurse Rethaford were deliberately indifferent to plaintiff's serious medical needs because they failed to provide him medical care for his withdrawal symptoms.  Defendants argue they are entitled to summary judgment because (1) plaintiff failed to exhaust his administrative remedies before bringing this lawsuit and (2) plaintiff has not presented evidence from which a reasonable juror could find for him on the subjective prong of the deliberate indifference test.

### a.  Exhaustion of Remedies

The CCS Defendants first argue that they are entitled to summary judgment because plaintiff failed to exhaust his administrative remedies.  Section 1997e(a) of the Prison Litigation Reform Act requires a prisoner to exhaust all administrative remedies before bringing a § 1983

lawsuit challenging the conditions of his confinement.  "[U]nexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

Under Detention Center policy, grievances must go through Level IV (Facility Administrator) before an inmate exhausts the grievance remedy.  Doc. 222-21 at 2.  The CCS Defendants argue that plaintiff failed to exhaust his administrative remedies on his claims that they failed to provide him proper medical care during the two weeks he was off of his medication.  In doing so, the CCS Defendants attempt to distinguish between grievances in which plaintiff complained that his medication was canceled and those premised on defendants' failure to provide medical treatment after the medication was discontinued.  The CCS Defendants argue that while plaintiff may have exhausted his remedies based on his grievance for canceling his medicine, he did not do so for the alleged mistreatment he suffered after his medicine was taken away.

After reviewing the record as a whole, which the Court may do, the Court concludes that plaintiff has exhausted his administrative remedies on his claims.  Plaintiff attaches three grievances to his response in opposition to defendants Denning and Dvorkak's motion for summary judgment.  Doc. 212 at 24-30.  These appear to be the Level II through Level IV appeals of his original, June 2, 2012 grievance.  In the Level II grievance, plaintiff complains of "headaches, throwing up, sleeplessness" and other injuries since his medication was discontinued.  Doc. 212 at 24.  Lt. Prothe denied that grievance, and plaintiff then filed a Level III grievance in which he complained that he "sustained injury (physical), pain, and suffering." *Id.* at 25-26.  After Capt. Shafer denied that grievance, plaintiff filed a Level IV grievance with Major Cortright.  *Id.* at 27.  When Major Cortright denied that grievance, plaintiff had filed appeals through all of the grievance levels, thereby exhausting his remedies.

After reviewing these grievances, the Court believes that they complain both about Dr. Pattison's decision to discontinue his medicine *and* that he suffered pain without his medication. Thus, the Court concludes that plaintiff has exhausted his remedies on his claim that the CCS Defendants failed to provide proper care after his medication was suspended.

### b.   Subjective Prong of Deliberate Indifference Test

Count I nonetheless fails because plaintiff has not presented facts from which a reasonable jury could find that plaintiff has established the subjective prong of the deliberate indifference test.  To satisfy the subjective prong, plaintiff must establish that "defendants knew about and disregarded a substantial risk of harm to [his] health and safety." *Mata v. Sainz*, 427 F.3d 745, 752 (10th Cir. 2005).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Holt v. McBride*, 539 F. App'x 863, 865 (10th Cir. 2013).  On this prong of the analysis, the relevant question is:  "[W]ere the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"  *Mata*, 427 F.3d at 753.

### i.   Dr. Pattison

Plaintiff alleges that Dr. Pattison was deliberately indifferent "in refusing to provide plaintiff with adequate mental health care, when he should have known or knew as a licensed health care professional . . . that the plaintiff needed medical attention for the unbearable withdraw[al] symptoms at the times he sought medical attention."  Doc. 159 at ¶ 50.  To succeed on the subjective prong, plaintiff must show that Dr. Pattison *consciously* knew of the serious medical risk to plaintiff and disregarded it.  *Mata*, 427 F.3d at 760.  Dr. Pattison has pointed out that plaintiff's claim against him lacks supporting evidence.  Plaintiff has produced no evidence in response to support his allegations that Dr. Pattison knew that discontinuing plaintiff's

medication would cause the symptoms he alleges.  Nor does plaintiff present any evidence that Dr. Pattison knew he was suffering withdrawal symptoms.  In fact, plaintiff's June 5, 2012 ICF is the only evidence in the record suggesting Dr. Pattison even knew plaintiff had complained about the decision to discontinue his medication.  Plaintiff requested a "Psych Dr." because "I need my meds" and "I am very mentally ill."  Doc. 223-12.  In response, Nurse Ann wrote, "Mr. Cox, Dr. Pattison has denied your medications."  *Id.*  Even if the Court assumes Dr. Pattison saw this grievance, plaintiff's bare allegations that he needed his medication and he was mentally ill do not suggest that Dr. Pattison knew that plaintiff was suffering severe withdrawal symptoms and still chose to disregard them.  No reasonable juror could find that Dr. Pattison acted with deliberate indifference to plaintiff's serious medical needs, so Dr. Pattison is entitled to summary judgment on Count I.

### ii.    Nurse Ann and Nurse Rethaford

Plaintiff alleges that Nurse Ann and Nurse Rethaford were deliberately indifferent because "they knew or should have known . . . that I needed medical attention for the unbearable withdraw[al] symptoms that I was suffering at the times I sought medical attention."  Doc. 159 at ¶ 51.  Nurse Ann and Nurse Rethaford argue that this claim lacks evidentiary support.  Plaintiff presents no evidence in response that either Nurse Ann or Nurse Rethaford knew plaintiff would suffer withdrawal symptoms when Dr. Pattison discontinued his medication or that he was suffering severe withdrawal symptoms.

The only evidence in the record of Nurse Ann's involvement after Dr. Pattison discontinued plaintiff's medicine was her response to plaintiff's June 5 grievance.  As discussed, on June 5, 2012, plaintiff requested a "Psych Dr.," claiming he was mentally ill and needed his medication.  Doc. 223-12.  In response, Nurse Ann wrote, "Mr. Cox, Dr. Pattison has denied

your medications." *Id.*  The June 5 grievance contains no information about any symptoms plaintiff was suffering.  Thus, plaintiff has presented no evidence that Nurse Ann knew plaintiff was suffering from a serious medical harm and was deliberately indifferent to it.

As for Nurse Rethaford, plaintiff alleges, "On my grievance dated, 6/2/12, Valerie Rethaford [] stated that my medication was discontinued because I told them I was cheeking them.  [Nurse Rethaford] did not schedule me for a sick call even though I stated I have a serious illness."  Doc. 159 at ¶ 22.  The June 2 grievance plaintiff references stated, "I have a serious mental health disease and I need [my medication]."  Doc. 223-7.  In response, Nurse Rethaford wrote, "Your medication was discontinued by the Psychiatrist as it was reported, and you have yourself confirmed, that you were cheeking your medication."  Doc. 223-8.  Plaintiff's June 2 grievance did not inform Nurse Rethaford that he was suffering any withdrawal symptoms.  As a result, plaintiff has failed to meet his evidentiary burden to show that Nurse Rethaford was aware of and disregarded his serious medical need.

* * *

Plaintiff has failed to provide sufficient evidence from which a reasonable juror could find that defendants knew about and disregarded a substantial risk of harm to his health and safety.  Because plaintiff has failed to satisfy the subjective prong of the deliberate indifference test, defendants Dr. Pattison, Nurse Ann, and Nurse Rethaford are entitled to summary judgment on Count I.

### 3.  Count II – Sheriff Denning and Sgt. Dvorak

In Count II, plaintiff alleges that Sheriff Denning adopted a policy or custom:  (1) to allow the CCS Defendants to deny or delay medical care to avoid costs at the Detention Center; and (2) to allow untrained deputies to screen medical complaints.  Count II also asserts that Sgt.

Dvorak was deliberately indifferent to plaintiff's serious medical needs when he rejected plaintiff's June 3 grievance. Because Sheriff Denning and Sgt. Dvorak are municipal employees, they assert a qualified immunity defense. This requires plaintiff to show: (1) their actions violated a constitutional or statutory right and (2) this right was clearly established. *Clark*, 513 F.3d at 1222.

### a.   Claim Against Sgt. Dvorak

Count II alleges that Sgt. Dvorak "acted in deliberate indifference to the serious needs of the plaintiff when he failed to forward the plaintiff's medical complaint to trained medical professionals when the risk was obvious." Doc. 159 at ¶ 66. Dr. Pattison discontinued plaintiff's medication on June 1, 2012. Over the next two days, plaintiff filed three grievances. Plaintiff filed his first grievance on June 2, 2012, complaining that he had a "serious mental health disease" for which he needed his medication. Doc. 207-8. Plaintiff filed his second grievance on June 2 as well, but he admits it is identical to the first grievance for all intents and purposes. Doc. 212 at 10 ("The two [grievances Sgt. Dvorak] received on 6/2/12, I admit, were the same."). On June 3, plaintiff filed a third grievance. It again complained about Dr. Pattison's decision to take away his medication but added, "I have been ill for 3 days withdrawing from my medication I shouldn't have had to withdraw[] from." Doc. 207-10.

As the Grievance Coordinator, Sgt. Dvorak was responsible for screening grievances filed by inmates and either accepting or rejecting them. On June 4, Sgt. Dvorak rejected the second June 2 grievance and the June 3 grievance because plaintiff failed to comply with Detention Center grievance procedures. Specifically, Sgt. Dvorak wrote, "Multiple grievances regarding the same matter will not be accepted." Doc. 207-14. Sgt. Dvorak stated that plaintiff's initial grievance was still pending before the nursing supervisor and that "[o]nce you receive a

response from the nursing supervisor . . . you may grieve to Lt. Prothe [at Level II] if you are not satisfied." *Id.*  In other words, Sgt. Dvorak rejected plaintiff's second and third grievances because he considered them identical to plaintiff's earlier grievance on which plaintiff had not yet exhausted his appeals.

Plaintiff argues that Sgt. Dvorak's rejection of the third grievance constitutes deliberate indifference to his serious medical needs, for which Sgt. Dvorak is personally liable for damages. As discussed above, plaintiff's claim fails on the objective prong of the deliberate indifference test.  But plaintiff's claim against Sgt. Dvorak also fails for two more reasons.

First, plaintiff presents no evidence to support his claim that Sgt. Dvorak's decision to reject the June 3 grievance *caused* plaintiff to suffer the withdrawal symptoms he alleges.  To avoid summary judgment on his Eighth Amendment claims, plaintiff must "set forth facts demonstrating that [his] medical need was objectively sufficiently serious, *and that defendants' delay in meeting that need caused [him] substantial harm*."  *Mata*, 427 F.3d at 752 (emphasis added).  Because Sgt. Dvorak was merely a gatekeeper for complaints to medical professionals, the relevant inquiry is whether the prison medical staff would have changed their treatment of plaintiff had they received the June 3 grievance.

The rejected June 3 grievance said, "I have been ill for 3 days withdrawing from my medication I shouldn't have had to withdraw[] from."  Doc. 207-10.  Plaintiff argues—without any evidentiary support—that his claims of "withdrawal" symptoms would have informed a medical professional that he was suffering serious medical harm.  But plaintiff has cited no facts or expert testimony that can establish a genuine issue of fact for trial that a medical professional would view the third grievance with the seriousness he asserts.  Because plaintiff presents

22

nothing more than conclusory allegations that Sgt. Dvorak caused his injuries, Sgt. Dvorak is entitled to summary judgment on Count II's claim against him.

In addition, plaintiff does not meet his evidentiary burden on the subjective prong of the deliberate indifference test. This prong requires plaintiff to show that Sgt. Dvorak knew about and disregarded a substantial risk of harm to his health and safety. *Mata*, 427 F.3d at 752. The only information Sgt. Dvorak knew about plaintiff's alleged ailments were the three grievances plaintiff filed on June 2 and 3, 2012. The first two grievances asserted simply that plaintiff had a mental health condition and needed his medicine. The third grievance was just slightly more specific, claiming plaintiff was ill and suffering withdrawal symptoms. Nothing in the three grievances, or the record as a whole, suggests Sgt. Dvorak *consciously* knew of a serious medical risk to plaintiff and disregarded that risk.

Indeed, Sgt. Dvorak is not a medical professional and he simply followed the prison grievance procedure. Detention Center procedure requires an inmate to exhaust an appeal of a grievance before filing a new grievance on the same claim. Plaintiff had been warned before not to submit grievances on the same subject without waiting for a response. Doc. 207-12 at 1. Here, it is uncontroverted that Sgt. Dvorak believed that plaintiff's complaint in the first grievance was the same as his complaints in the second and third grievances. *See* Doc. 206 at ¶ 26. Because plaintiff had not exhausted the appeal process on his first grievance, Sgt. Dvorak followed procedure and rejected the second two grievances. For all of those reasons, plaintiff has failed to present sufficient evidence from which a reasonable juror could find that Sgt. Dvorak violated his clearly established constitutional right. Sgt. Dvorak is entitled to summary judgment on Count II's claim against him.

### b.  Claims Against Sheriff Denning

Plaintiff asserts that Sheriff Denning was in charge of supervising the medical care and treatment for inmates at all times relevant to this lawsuit.  In this capacity, according to plaintiff, Sheriff Denning adopted a policy or custom (1) "to allow medical companies and contractors . . . to deny or delay medical care to avoid costs at the detention center creating inadequate medical care"; and (2) "to allow untrained deputies to screen medical complaints and reject them based on merits which created inadequate medical care . . . ."  Doc. 159 at ¶¶ 64, 65.

The initial issue the Court must confront is whether plaintiff has sued Sheriff Denning in his official capacity, his individual capacity, or both.  Because Sheriff Denning is a municipal employee, plaintiff can recover money damages by suing him in either his individual or official capacity.

Individual capacity suits seek to impose liability on a government official for actions he takes under color of state law.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  To recover damages, the plaintiff need only show that the official, acting under color of state law, caused the deprivation of a federal right.  *Id.* at 166.  In contrast, official capacity suits are just another way to plead an action against the government entity of which the governmental official serves as an agent.  *Id.* at 165.  An official capacity suit seeks damages against the government entity itself, not the individual.  *Id.* at 166.  However, for the government entity to be liable for damages, the plaintiff must meet a greater burden:  The entity's policy or custom must have played a part in the violation of federal law.  *Id.*  A government entity cannot be held liable under § 1983 on a *respondeat superior* basis.  *Id.* at 168.

The Second Amended Complaint is not clear about how plaintiff pursues a claim against Sheriff Denning.  Paragraph 9 says, "For all aforementioned times, the defendant Frank Denning

[] was acting individually and in his official capacity as the sheriff of Johnson County, KS," and plaintiff seeks compensatory damages from all defendants. Doc. 159 ¶¶ 9, 86. On the other hand, both allegations against Sheriff Denning in Count II assert that he "adopted a policy or custom" that led to a constitutional violation. *Id.* at ¶¶ 64, 65. A plaintiff need only plead a policy or custom if he seeks to recover against the government entity.

Defendants assume that plaintiff brings his "policy or custom" claims against Sheriff Denning in his official capacity only, and plaintiff does not dispute this proposition. On the contrary, in his brief opposing summary judgment, plaintiff titled the section arguing against summary judgment on Count II's claims against Sheriff Denning, "Official Capacity Claims," and he argued only that Sheriff Denning had created a policy causing constitutional violations. Doc. 212 at 17. Thus, plaintiff appears to concede that he asserts official capacity claims only. Even so, because the Court must review a pro se plaintiff's pleadings liberally, the Court will construe Count II as alleging a claim against Sheriff Denning in both his official and individual capacities.

### i. Individual Capacity Claims

The Court starts by evaluating plaintiff's claims as ones against Sheriff Denning in his individual capacity. A § 1983 defendant sued in an individual capacity may be subject to both personal liability and supervisory liability. *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). Personal liability under § 1983 requires personal involvement by the defendant in the alleged constitutional violation. *Id.* Supervisory liability, on the other hand, requires a plaintiff to show that: (1) the defendant promulgated, created, implemented, or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) the defendant acted with the state of mind required to establish the alleged constitutional

deprivation.  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).  Supervisory liability necessarily requires the plaintiff to establish first that the supervisor's subordinates violated the Constitution.  *Id.* at 1195.

Plaintiff presents no evidence that Sheriff Denning was personally involved in any violation of plaintiff's Eighth Amendment rights, so plaintiff only can claim supervisory liability. However, plaintiff also has failed to meet his evidentiary burden required to survive summary judgment to the extent he asserts a supervisory liability claim.  Plaintiff has not shown that Sgt. Dvorak, Sheriff Denning's subordinate, or any of the CCS Defendants violated the Constitution. Even if the Court assumes some official violated plaintiff's Eighth Amendment rights, plaintiff has presented no evidence that Sheriff Denning created a policy that *caused* plaintiff's harm. Thus, plaintiff has not produced sufficient evidence to create a genuine issue of material fact on the first prong of the qualified immunity test, so Sheriff Denning is entitled to summary judgment on the individual capacity claims against him.

### ii.    Official Capacity Claims

Plaintiff's official capacity claims fail to survive summary judgment for similar reasons. A plaintiff suing a municipality under § 1983 for acts by one of its employees must prove: (1) that a constitutional violation occurred; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998).  A court will not hold a municipality liable for constitutional violations when none of the municipality's officers committed an underlying constitutional violation.  *Olsen*, 312 F.3d at 1317-18.

As discussed above, plaintiff has failed to show that he suffered harm rising to the level of a constitutional violation.  Defendants deserve summary judgment on Count II's official

capacity claims for this reason alone.  Furthermore, the second prong of the municipal liability

test requires plaintiff to show a "direct causal link" between the municipal action and the

deprivation of federal rights.  *Dodds*, 614 F.3d at 1202.  Again, plaintiff has failed to present any

evidence showing that Sheriff Denning's policies *caused* the harm plaintiff alleges.  Thus,

plaintiff has not produced sufficient evidence to create a genuine issue of material fact on the

first prong of the qualified immunity test.  This also entitles Sheriff Denning to summary

judgment on the official capacity claims plaintiff asserts against him.

### 4.  Count III – CCS

In Count III, plaintiff alleges that CCS was deliberately indifferent to his serious medical

needs because it adopted policies or customs:  (1) allowing its employees and contractors to

punish inmates by taking away their medical treatment and denying requests without evaluations;

(2) allowing untrained sheriff's deputies to screen medical complaints to avoid costs and

liability; and (3) allowing nurses with little or no mental health training to screen mental health

complaints.  Doc. 159 at ¶¶ 74-76.

A private actor, like CCS, cannot be held liable solely because its employees violated

plaintiff's constitutional rights.  *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir.

2005).  Rather, plaintiff must show that CCS "directly caused the constitutional violation by

instituting an 'official municipal policy of some nature' . . . that was the 'direct cause' or

'moving force' behind the constitutional violations."  *Id.* (quoting *Pembaur v. City of Cincinnati*,

475 U.S. 469, 480-85 (1986); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985)).

Plaintiff's claims against CCS fail at the outset because, as discussed in the sections analyzing

Counts I and II, he did not produce sufficient evidence from which a reasonable jury could

conclude that he had satisfied the objective prong of the deliberate indifference test.  Plaintiff's claims in Count III fail for three additional reasons.

Plaintiff first asserts that CCS has policies to punish inmates by taking away their medicine and to deny requests without evaluations.  CCS does have a policy to discontinue an inmate's medication when he cheeks it.  Doc. 223-18 at 3 ("Inmates found to be cheeking or palming medications will have the medications discontinued.").  However, the policy gives doctors discretion to crush the medicine or provide it in liquid form if "medications cannot be discontinued."  *Id.*  Because CCS doctors have discretion to override the standard procedure of discontinuing medicine if that procedure will cause harm to the inmate, there is no evidence that CCS's policy directly caused plaintiff's alleged withdrawal symptoms.  Furthermore, the Court agrees with other district courts that have held that a decision to discontinue medication for concerns of abuse does not amount to deliberate indifference.  *See, e.g.*, *Atakpu v. Lawson*, No. 1:05-CV-524, 2008 WL 5233467, at *11 (S.D. Ohio Dec. 11, 2008) ("In the absence of any evidence showing that plaintiff's medication was discontinued for a reason other than suspected abuse, plaintiff has failed to raise an issue of fact requiring resolution by a jury."); *Shea v. Wheeler*, No. 00-C-72-C, 2001 WL 34376846, at *6 (W.D. Wis. June 19, 2001) (holding that a prison doctor's decision to discontinue an inmate's prescription for misuse did not constitute deliberate indifference).  Plaintiff also argues that CCS has a policy to deny medical requests without evaluation, but he presents no evidence that such a policy exists or that it caused plaintiff harm.

Next, plaintiff claims that CCS adopted a policy or custom of allowing untrained sheriff's deputies to screen medical complaints.  However, it is undisputed that the Sheriff's Department, not CCS, implemented the grievance screening policy.  The Johnson County Sheriff's Office

policy states, "All grievances will be routed to the Grievance Coordinator."  Doc. 223-20 at 2.

Thus, plaintiff has not identified a CCS policy that allows untrained sheriff's deputies to screen

medical complaints.

Last, plaintiff asserts that CCS has a policy or custom of allowing nurses with little or no

mental health training to screen mental health complaints.  This claim fails because plaintiff

presents no evidence that this policy was the "direct cause" or "moving force" behind the

constitutional harm he claims.  *Smedley*, 175 F. App'x at 946.  Moreover, defendants have shown

that nurses often confer with medical doctors, like Dr. Pattison, before denying grievances.  In

her response to plaintiff's June 5 grievance, Nurse Ann wrote, "Mr. Cox, Dr. Pattison has denied

your medications."  Doc. 223-12.  For the foregoing reasons, defendant CCS is entitled to

summary judgment on Count III.

## C.  State Law Claims

In Counts IV and V of plaintiff's Second Amended Complaint, he alleges state law

negligence claims against defendants.  The Court addresses each claim in turn, below.

### 1.  Count IV – Dr. Pattison and the CCS Defendants

In Count IV, plaintiff asserts a Kansas state law claim for medical negligence against Dr.

Pattison and the CCS Defendants.  Specifically, he alleges that these defendants "failed to

exercise the degree of necessary care and skill and failed to properly diagnose, evaluate, and treat

the Plaintiff's condition."  Doc. 159 at ¶ 83.

"The plaintiff in a medical malpractice case bears the burden of showing not only the

doctor's negligence, but that the negligence caused the injury."  *Hare v. Wendler*, 949 P.2d 1141,

1146 (Kan. 1997) (internal citation omitted).  "Except where the lack of reasonable care or the

existence of proximate cause is apparent to the average layman from common knowledge or

experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation." *Id.* (internal citations omitted). Here, plaintiff has failed to designate any expert witnesses and his deadline to do so has passed. Therefore, plaintiff cannot offer expert testimony on the applicable standard of care or to prove causation.

For that reason, defendants are entitled to summary judgment on Count IV unless the common knowledge exception applies. Plaintiff makes no argument on this point, but the Court considers this issue on its own initiative. The common knowledge exception applies only when "the lack of reasonable care or the existence of causation is apparent to the average layman from common knowledge or experience." *Watkins v. McAllister*, 59 P.3d 1021, 1023 (Kan. Ct. App. 2002) (citing *Hare*, 949 P.2d at 1146). Whether the exception applies is a question of law. *Perkins v. Susan B. Allen Mem'l Hosp.*, 146 P.3d 1102, 1105 (Kan. Ct. App. 2006). "[T]he application of the common knowledge exception is extremely limited" and most often applies to cases where a physician leaves a sponge or surgical instrument in the patient after surgery. *Munoz v. Clark*, 199 P.3d 1283, 1288 (Kan. Ct. App. 2009); *Schwartz v. Abay*, 995 P.2d 878, 880 (Kan. Ct. App. 1999). "[T]he well-established test for determining whether expert testimony is required is whether the subject matter is too complex to fall within the common knowledge of the jury and is beyond the capability of a layperson to decide." *Williamson v. Amrani*, 152 P.3d 60, 73 (Kan. 2007) (internal citation and quotation marks omitted).

Here, the care and treatment of plaintiff is not something within the common knowledge of the jury. Plaintiff must prove that defendants failed to meet the appropriate standard of care and that defendants' deviation from that standard, *i.e.*, their decision to discontinue plaintiff's medication *caused* his alleged injuries. *Hare*, 949 P.2d at 1146. A layperson does not possess the knowledge to determine whether the medication prescribed to plaintiff can create

dependencies leading to serious withdrawal symptoms.  Because the common knowledge exception does not apply, plaintiff must adduce expert testimony to prove his state law medical negligence claims.  Plaintiff has not designated any experts and the time to do so has passed.  As a result, the Court grants summary judgment for Dr. Pattison and the CCS Defendants on Count IV of plaintiff's Second Amended Complaint.

### 2.   Count V – Sheriff Denning and Sgt. Dvorak

In Count V, plaintiff brings state law negligence claims against Sheriff Denning and Sgt. Dvorak.  Plaintiff asserts that Sgt. Dvorak was negligent because he rejected plaintiff's June 3 grievance.  Plaintiff asserts that Sheriff Denning was negligent because he created a policy or custom allowing untrained deputies to screen medical complaints.  To recover for negligence under Kansas law, "the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered."  *Thomas v. Cnty. Comm'rs of Shawnee Cnty.*, 262 P.3d 336, 346 (Kan. 2011) (internal quotation marks and citations omitted).

As discussed above, Sgt. Dvorak served as the Grievance Coordinator at the Detention Center.  This role required him to review and decide whether to accept or reject inmate grievances.  After Dr. Pattison discontinued plaintiff's medication, plaintiff filed three grievances between June 2 and 3, 2012.  Sgt. Dvorak forwarded plaintiff's first grievance to the nursing supervisor, but he rejected the second and third grievances because he believed they duplicated the first one.  Plaintiff's third grievance, filed on June 3, largely replicated the first two, except it added, "I have been ill for 3 days withdrawing from my medication I shouldn't have had to withdraw[] from."  Doc. 223-10.  Plaintiff asserts Sgt. Dvorak interfered with his medical care by failing to forward the June 3 grievance to the prison medical staff.

Sgt. Dvorak first argues that he had no duty to forward plaintiff's grievances.  "Whether a legal duty exists is a question of law."  *Irvin v. Smith*, 31 P.3d 934, 942 (Kan. 2001).  A review of Kansas law reveals that prison officials have a legal duty to "'take reasonable action to protect [inmates] against unreasonable risk of physical harm.'"  *Estate of Belden v. Brown Cnty.*, 261 P.3d 943, 962 (Kan. Ct. App. 2011) (quoting Restatement (Second) of Torts § 314A (1965)).  Thus, the Court rejects Sgt. Dvorak's assertion that he had no recognized legal duty to plaintiff.  Furthermore, "[w]hether the duty has been breached is a question of fact," so the Court cannot grant summary judgment on the breach element of the negligence test either.  *Calwell v. Hassan*, 925 P.2d 422, 428 (Kan. 1996).

However, Sgt. Dvorak also argues that plaintiff has failed to produce evidence that possibly could support the causation element.  "[W]here no evidence is presented on a particular [element of negligence], or the evidence presented is undisputed and it is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice, the matter becomes a question of law for the court's determination."  *Martell v. Driscoll*, 302 P.3d 375, 386 (Kan. 2013) (internal citation omitted).  Plaintiff has presented no evidence from which a rational jury could find that Sgt. Dvorak's decision to deny plaintiff's June 3 grievance caused him to suffer the withdrawal symptoms he claims.  Nothing in the record demonstrates that suspending plaintiff's medication could even cause withdrawal symptoms like those plaintiff asserts.  Also, plaintiff has adduced nothing more than his own conclusory, lay opinion—without citation to the record—that the medical staff would have treated him differently had they received the June 3 grievance.  Thus, based on the minimal evidence before the Court, no reasonable juror could conclude that Sgt. Dvorak's decision to

reject the June 3 grievance caused plaintiff harm.  Sgt. Dvorak is entitled to summary judgment on Count V.

That leaves Sheriff Denning.  Plaintiff claims that Sheriff Denning was negligent in creating a policy or custom that allowed untrained deputies like Sgt. Dvorak to screen medical grievances.  However, as the Court just discussed, plaintiff has failed to present sufficient evidence that Sgt. Dvorak's decision to reject his June 3 grievance constituted negligence.  For that reason, plaintiff has not shown that this policy caused him any harm.  Because plaintiff has failed to create a genuine issue of material fact on Count V's claim against Sheriff Denning and Sgt. Dvorak, the Court grants summary judgment for defendants.

### D.  Nurse John Doe

Counts I and IV of plaintiff's Second Amended Complaint name "Nurse John Doe" as a defendant.  It is possible that plaintiff included this defendant accidentally.  Plaintiff named Nurse John Doe in his initial and first Amended Complaints, but in a September 9, 2013 Minute Entry, Judge Rushfelt wrote:  "Plaintiff intends to file on or before 9/25/13, a motion to amend the amended complaint by deleting Nurse John Doe as a party [defendant] . . . ."  Doc. 139.  Then, in plaintiff's Second Amended Complaint, he crossed out ¶ 8 containing allegations against Nurse John Doe.  Doc. 159 at ¶ 8.  Nevertheless, the Court must construe plaintiff's pleadings liberally, and therefore it assumes plaintiff continues to assert claims against Nurse John Doe.

Plaintiff has not served Nurse John Doe.  Under Fed. R. Civ. P. 4(m), "[i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against the defendant or order that service be made within a specified time."  Plaintiff filed his Second Amended Complaint on

November 18, 2013, so the 120 day deadline for service has passed.  As a result, the Court

directs plaintiff to show cause in writing to the Court no later than March 16, 2015 why it should

not dismiss his claims against defendant Nurse John Doe for failing to serve him under Fed. R.

Civ. P. 4(m).  If plaintiff fails to respond by March 16, 2015, the Court will dismiss his claims

against Nurse John Doe without prejudice.

### IV.  Plaintiff's Objection to Magistrate's Memorandum and Order (Doc. 251)

On November 26, 2014, plaintiff filed an objection to Judge Rushfelt's November 19,

2014 Order (Doc. 250) under D. Kan. Rule 72.1.4.  Judge Rushfelt's November 19 Order denied

two motions plaintiff had filed:  (1) his Motion for Appointment of Counsel or, in the alternative,

Motion for Expert Witness Appointments and order allowing Defendants' Legal Books/Materials

(Doc. 235); and (2) his Motion for Continuance (Doc. 241).  Judge Rushfelt denied plaintiff's

Motion for Continuance as moot but extended the deadlines for plaintiff to respond to

defendants' summary judgment motions.  Plaintiff only seeks review of Judge Rushfelt's

decision denying his motion requesting appointment of counsel, appointment of expert

witnesses, and legal books and materials.

### A.  Legal Standard for Review of Magistrate Orders

On nondispositive pretrial matters, a district court does not conduct a de novo review of

the magistrate judge's order.  Instead, a district court applies a more deferential standard which

requires the moving party to show that the magistrate judge's order is "clearly erroneous or

contrary to law."  *First Union Mortg. Corp. v. Smith*, 229 F.3d 992, 995 (10th Cir. 2000); Fed. R.

Civ. P. 72(a).  The "clearly erroneous" standard means a reviewing court must affirm unless,

after reviewing all of the evidence, it is left with the definite and firm conviction that a mistake

has been committed.  *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988).

The "contrary to law" standard permits the district court to conduct an independent review of purely legal determinations made by the magistrate judge. *Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1346 (D. Kan. 2007) (citations omitted). A magistrate judge's order is contrary to law if it "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Walker v. Bd. of Cnty. Comm'rs of Sedgwick Cnty.*, No. 09–1316–MLB, 2011 WL 2790203, at *2 (D. Kan. July 14, 2011). Harmless error by a magistrate judge does not warrant reversal. *See Riviera Drilling & Exploration Co. v. Gunnison Energy Corp.*, 412 F. App'x 89, 95 (10th Cir. 2011).

### B.  Background

On August 14, 2014, plaintiff filed a motion asking the Court to appoint him counsel or, in the alternative, expert witnesses in this case. Plaintiff also sought an order granting him access to certain legal books and materials. Plaintiff had filed two previous motions for appointment of counsel (Docs. 32, 78), but Judge Rushfelt denied both without prejudice (Docs. 47, 95). Plaintiff also had filed a previous motion for appointment of expert witnesses (Doc. 148), which Judge Rushfelt also denied without prejudice (Doc. 182). Plaintiff incorporated all of his previous motions for counsel and expert witnesses in his August 14, 2014 motion.

### 1.  Motion for Appointment of Counsel

#### a.  Legal Standard

There is no constitutional right to appointed counsel in a civil case. *Sandle v. Principi*, 201 F. App'x 579, 582 (10th Cir. 2006). However, 28 U.S.C. § 1915(e)(1) permits the Court to "request an attorney to represent" a party proceeding *in forma pauperis*. The Court has granted plaintiff leave to prosecute this action *in forma pauperis*. The Court emphasizes that § 1915(e)(1) merely permits the Court to *request* an attorney to represent an indigent defendant

in a civil case and does not authorize the Court to *require* an unwilling attorney to take the case. *Loftin v. Dalessandri*, 3 F. App'x 658, 663 (10th Cir. 2001).  Thus, to the extent plaintiff requests the Court to *appoint* counsel, the Court lacks the power to do so.  The Court only may seek a volunteer attorney to represent him.  Furthermore, Congress provides no method for compensating attorneys that take on a case under § 1915(e)(1), so attorneys who do so will usually be serving pro bono.  *Id.*  As a result, the Court exercises this power sparingly.

Section 1915(e)(1) grants broad discretion for courts to request counsel to represent an indigent party.  *Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 749 (10th Cir. 2009).  In exercising its discretion, the Tenth Circuit directs district courts to consider:  (1) the merits of the litigant's claims; (2) the nature of the factual issues raised in the claims; (3) the litigant's ability to present the claims; and (4) the complexity of the issues raised by the claims. *Sandle*, 201 F. App'x at 582.  "'The burden is on the applicant to convince the court that there is sufficient merit to his claim to warrant the appointment of counsel.'"  *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004) (quoting *McCarthy v. Weinberg*, 753 F.2d 836, 838 (10th Cir. 1985)).

### b.  Discussion

In his objection to Judge Rushfelt's latest order denying his motion for counsel, plaintiff essentially argues that Judge Rushfelt clearly erred when he applied the Tenth Circuit's factors. Therefore, the Court must affirm Judge Rushfelt's decision unless the Court, after reviewing all of the evidence, is left with the definite and firm conviction that he erred.  *Ocelot Oil Corp.*, 847 F.2d at 1464.

The first factor directs the Court to consider the merits of plaintiff's claims.  As discussed above, plaintiff's Second Amended Complaint asserts that defendants were deliberately

indifferent to his serious medical needs when they failed to treat his withdrawal symptoms properly after Dr. Pattison discontinued his medication.  Plaintiff also brings state law negligence claims.  After reviewing the record and defendants' motions for summary judgment, the Court has granted summary judgment for defendants on all five claims plaintiff asserts.  As a result, plaintiff has not met his burden to convince the Court that his claims are sufficiently meritorious to warrant appointment of counsel.

On the second factor, the Court considers the nature of the factual issues raised in the claims.  Here, plaintiff brings claims against prison personnel about events directly involving plaintiff.  The Court concludes this factor weighs against plaintiff's motion because plaintiff did not require a professional's training or experience to explain what allegedly happened to him.

The third factor directs the Court to evaluate plaintiff's ability to present his claims.  On this factor, Judge Rushfelt wrote that plaintiff "has already shown a remarkable ability to represent himself for the past two years in this case, as well as in other litigation."  Doc. 250 at 6.  Judge Rushfelt noted that plaintiff has filed numerous pleadings, motions, and memoranda; cited and discussed a substantial number of relevant laws and reported cases; and represented himself in a number of phone conferences with the Court.  Furthermore, plaintiff survived a motion for summary judgment without the assistance of counsel in another case pending before this Court, *Cox v. Denning, et al.*, Case No. 12-2571-DJW.  The Court agrees.  Plaintiff has demonstrated more than adequate ability to present his claims.  The shortcomings in plaintiff's claims are not derived from plaintiff's capacity to advocate.

Finally, the Court must consider the complexity of plaintiff's claims.  The factual and legal issues here are not complex.  As discussed, plaintiff has litigated this case for over two years, and at no point have plaintiff's claims exceeded his understanding.

37

Considering the above four factors, the Court concludes that Judge Rushfelt's decision to deny plaintiff's motion for appointment of counsel was not clearly erroneous.

### 2.   Motion for Appointment of Expert Witnesses

Plaintiff also seeks review of Judge Rushfelt's order denying his request for appointment of expert witnesses.  A district court may appoint expert witnesses under Fed. R. Evid. 706(b) or D. Kan. Rule 26.4.  "The determination to appoint an expert rests solely in the Court's discretion and is to be informed by such factors as the complexity of the matters to be determined and the Court's need for a neutral, expert view."  *Brown v. Gray*, No. 06-3003-JTM, 2011 WL 6091738, at *6 (D. Kan. Dec. 7, 2011) (internal citation omitted).  However, the *in forma pauperis* statute, 28 U.S.C. § 1915(c) does not provide for payment of expert witness fees.  *Patel v. United States*, 399 F. App'x 355, 359 (10th Cir. 2010).  Rather, under Fed. R. Evid. 706(c) and D. Kan. Rule 26.4, each party typically splits the costs of a court-appointed expert.  Plaintiff proceeds *in forma pauperis* here, so in reality defendants would bear the entire cost of an expert if the Court decided to appoint one.  Accordingly, the Court exercises this power sparingly.

Plaintiff argues that he needs expert witnesses to rebut expert testimony defendants used to support their motions for summary judgment.  However, the Court did not rely on defendants' experts when deciding defendants' summary judgment motions, both because the experts were not necessary to the Court's decision and because the Court has tried to avoid potential unfairness to plaintiff.

It is true that the Court granted summary judgment against Count IV of plaintiff's Second Amended Complaint because plaintiff failed to produce an expert witness to support his medical malpractice claim.  However, the Tenth Circuit has not required courts to provide indigent plaintiffs with experts in medical negligence cases.  In *Patel v. United States*, the Tenth Circuit

affirmed the district court's decision to deny the plaintiff's motion for an expert witness even though expert testimony was "essential" to allow the plaintiff's medical negligence claim to survive summary judgment. 399 F. App'x at 359. To support its decision, the Tenth Circuit quoted approvingly a passage from a Third Circuit case:

> The plaintiffs' dilemma in being unable to proceed in this damage suit because of the inability to pay for expert witnesses does not differ from that of nonprisoner claimants who face similar problems. Nonprisoners often resolve that difficulty through contingent fee retainers with provisions for arranging expert testimony. By seeking government funding in this case, plaintiffs are in effect asking for better treatment than their fellow-citizens who have not been incarcerated but who have at least equal claims for damages.

*Id.* (quoting *Boring v. Kozakiewicz,* 833 F.2d 468, 474 (3d Cir.1987)). The Tenth Circuit also noted that the district court did not abuse its discretion when it declined to appoint an expert witness in part because the district court conducted an independent examination of the plaintiff's medical records. *Id.*

The Court similarly has reviewed plaintiff's medical records here. Plaintiff has presented no objective evidence of injury; rather the objective evidence in the record tends to negate plaintiff's injury claims. Because the Court is not required to appoint an expert in a medical negligence case and there is no objective evidence to support plaintiff's injury claims, the Court concludes Judge Rushfelt did not abuse his discretion in denying plaintiff's motion for appointment of expert witnesses.

### 3.  Request for Legal Books/Materials

Plaintiff's August 14, 2014 motion also asked the Court "to order the prison to allow my grandmother to mail by First Class U.S. mail" four legal books. Doc. 235 at 6. Judge Rushfelt noted that the Court lacked authority to order the state or its prison facility, both non-parties to this case, to allow the requested mailing. As a result, Judge Rushfelt denied plaintiff's request

for lack of jurisdiction.  The Court similarly finds no authority that allows it to order a Kansas

prison to accept books in the manner plaintiff requests.  The Court further notes that, given

plaintiff's extensive citation to legal authority and case law in this lawsuit, he appears to have

had adequate access to legal books and library facilities.  The Court concludes Judge Rushfelt

was correct when he denied plaintiff's request for legal books and materials, and thus it denies

plaintiff's Objection to Magistrate's Memorandum and Order.[2]

## V.  Conclusion

For the foregoing reasons, the Court grants summary judgment for defendants (except

defendant Nurse John Doe) on all five Counts in plaintiff's Second Amended Complaint.  The

Court orders plaintiff to show cause in writing why the Court should not dismiss his claims

against defendant Nurse John Doe for failure serve him under Fed. R. Civ. P. 4(m).  The Court

denies as moot plaintiff's Motion for Continuance and for Defendant Pattison to Clear Up His

Summary Judgment Motion.  Finally, the Court denies plaintiff's Objection to Magistrate's

Memorandum and Order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Sheriff

Denning and Sgt. Dvorak's Motion for Summary Judgment (Doc. 205) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Dr. Keith

Pattison's Motion for Summary Judgment (Doc. 216) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** the CCS Defendants' Motion

for Summary Judgment (Doc. 221) is granted.

---

[2] Plaintiff's Objection to Magistrate's Memorandum and Order also requested, for the first time, that Judge Rushfelt recuse himself from this lawsuit.  Doc. 251 at 3.  Judge Rushfelt denied plaintiff's request in a December 18, 2014 Order (Doc. 252).  Plaintiff does not seek review of Judge Rushfelt's order declining to recuse himself, so the Court need not consider it.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff's Motion for Continuance and for Defendant Pattison to Clear Up His Summary Judgment Motion (Doc. 234) is denied as moot.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff's Objection to Magistrate's Memorandum and Order (Doc. 251) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff shall show cause in writing to this Court no later than March 16, 2015, why plaintiff's claims against defendant Nurse John Doe should not be dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m).  If he does not show sufficient cause, the Court will dismiss these claims without prejudice.

**IT IS SO ORDERED.**

**Dated this 27th day of February, 2015, at Topeka, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**